UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

            CRIMINAL CASE NO. 05-50027

v.

HAYWOOD MANUEL JOHNSON,   HONORABLE PAUL V. GADOLA
                U.S. DISTRICT COURT
         Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO QUASH**

Defendant Haywood Johnson was charged on April 20, 2005 with possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k); possession of sawed-off shotgun, 28 U.S.C. § 5681(d); and felon in possession of firearms, 18 U.S.C. § 922(g)(1). Defendant filed a motion to quash the indictment on May 31, 2005. Defendant seeks to quash the indictment (and in the process suppress the evidence of the firearms) on the grounds that 1) the state arrest warrant which ultimately resulted in the search and seizure of Defendant's firearms was not supported by probable cause, and 2) the consent obtained from Defendant's wife to search his residence was coerced. For the following reasons, the Court will deny the motion.

**I. Factual Background**

This case revolves around the murder of Roderick Bradshaw, who was murdered on the afternoon of Sunday, August 22, 2004, at the residence of Martin Daron Newman. Gana Green, the mother of Newman's children, discovered Bradshaw's body in the bathroom—he had been shot four times with a .44 caliber pistol. Green ran to a neighbor's house, who called the police. Genesee

Township Police officers responded shortly. Detective Curt Scheidler headed the investigation.

Scheidler interviewed Green and Newman's neighbor, Delone Hardnett. Green stated that Newman's residence was a drug house which individuals would regularly visit to get high. She stated that Bradshaw and Newman were long-time friends who would regularly get high together and that crack cocaine was their drug of choice. She also stated that Bradshaw was a crack "fiend" who was greedy with his crack and that a week or two prior to Bradshaw's murder a dispute had developed between the two relating to a drug purchase. Newman had given Bradshaw $50.00 to buy a gram of crack cocaine and had accused Bradshaw of shorting him on the drug purchase. Green stated that Newman told Bradshaw not to return until he had rectified the discrepancy, but Bradshaw never had. Green was reluctant to call the incident a "disagreement" because the two often acted in this manner. Green stated that it was nothing violent.

Harnett stated that Newman was at his house earlier in the day to help Hardnett cut his weeds. While there, Bradshaw, who Hardnett did not recognize at the time, pulled up in his gray truck. After Newman spoke with Bradshaw, he got into his own vehicle and followed Bradshaw back to Newman's residence. After a few minutes, Newman returned to Hardnett's house, asked for a beer, and told Hardnett that he was returning to his house to see if Bradshaw had the money that Bradshaw owed him. After a brief while, Newman returned yet again, stating that Bradshaw did not have his money. A short while later, Newman returned a third time, but this time visibly troubled. According to Hardnett, Newman stated that he was worried because he was present for something that someone else did and that he might go to jail for it. Hardnett told him to call the police. Newman then left. Newman later called Hardnett on the phone and said, "It don't look good

for me something's wrong, something's messed up and I don't know what to do . . . I didn't I told the guy that I didn't even want to ride with him I didn't know that he was going to do this . . . ." Mot., Ex. 2 at 19.  Hardnett again told Newman to go to the police.

Scheidler also interview Newman's neighbor, Edward Graham, who stated that on August 21, 2004 he witnessed Corey Green speak with Newman at Newman's residence.  Graham stated that Corey Green said, "That m**** f**** owes me money.  If he ain't got my money, it ain't going to be nice."  Mot., Ex. 6 at 7.  The police confronted Corey Green with this statement, telling him that a witness had stated that he, Corey Green, had went to Newman's residence looking for Bradshaw because Bradshaw owed him money and that if Bradshaw did not pay up, it was not going to be pretty.  Corey Green, however, denied visiting Newman that day.  He stated that he did not even know Bradshaw and that he did not like to visit Newman's residence because of the prevalent drug and alcohol abuse that took place there.  Corey Green did state that he believed that Newman knew something of Bradshaw's murder.

Newman arrived at his residence later that evening and was escorted to the police department where he was interviewed.  In his initial interview, he told Scheidler that he had been at Harnett's house when Bradshaw came by.  They had made plans to meet at his house, but that Bradshaw never arrived.  Eventually, he wandered back over to Hardnett's house where he stayed until later that evening when he went over to his uncle's, the Defendant, to work on a car.  When he could not get the car to start he returned home where he was met by the police.  Scheidler then confronted Newman with Hardnett's statement regarding what Newman had said, but Newman denied having said such things to Hardnett.  Newman repeatedly stated that he had no knowledge of what

happened. He admitting to owning a small-caliber (.22) rifle. After the interview, in the early hours of August 23, 2004, Scheidler arrested Newman for the murder of Bradshaw.

The next day, after having spoken with his attorney, Newman gave Schielder another statement. The statement was made while Newman was in jail and in the presence of his attorney. Newman stated that while he and Bradshaw were at his house, Bradshaw had used the bathroom and he, Newman, had gone outside to wait on the porch. While waiting, Newman's uncle and aunt, Defendant and Noreen Johnson, drove up to his residence and asked him about working on a vehicle for them. Recognizing Bradshaw's vehicle, Defendant asked Newman if Bradshaw was inside the house. Newman told Defendant that Bradshaw was using the bathroom, but would be right out. Defendant retrieved a large-caliber, gray revolver from inside the vehicle, stuck it into his waist band, and said that he would talk to Bradshaw in the bathroom. Defendant went into the house, Newman and his aunt heard three gunshots, and Defendant came outside. Defendant told Newman that he should leave. Defendant calmly got into his car and left the scene. Newman left the scene and returned to Hardnett's residence. Newman stated that Defendant believed that Bradshaw was responsible for the murder of Defendant's son, Haywood Vance Johnson, three years prior. Newman thought that this belief motived Defendant to kill Bradshaw.

On August 27, 2004, Scheidler interview Bradshaw's ex-wife, Sarah Knight. She stated that Bradshaw had moved from a previous residence because of a drive-by shooting which occurred there shortly after the murder of Defendant's son. She stated that some of Defendant's family thought that Bradshaw had something to do with the murder. Scheidler also interviewed Bradshaw's bother, Angelo Bradshaw, that same day. He also stated that Bradshaw had moved from his previous

4

residence because of a drive-by shooting. He believed that the shooter might have been related to Defendant's son. Scheidler visited Bradshaw's former residence and found bullet holes in the front of the residence. The current resident confirmed that Bradshaw had moved after a drive-by shooting resulting from the murder of Defendant's son. The drive-by shooting was also confirmed by a Flint police report of the incident. Despite canvassing the neighborhood, however, Scheidler was unable to find a witness who had seen Defendant at the scene of the murder.

On August 31, 2004, Scheidler gave a Genesee District Court Judge a sworn statement summarizing Newman's second account of Bradshaw's murder. The Judge found probable cause and signed an arrest warrant for Defendant. On September 1, 2004, Scheidler went to Defendant's residence to arrest him. During the arrest, Defendant's wife consented to a search of the residence. The search revealed two firearms under Defendant's bed. Schielder stated that Defendant actually told the police that there were a couple of guns in the house and that they could be found under Defendant's mattress. Defendant was tried in Genesee Circuit Court, in February 2005, but a mistrial resulted because the jury could not reach a verdict. A second case lead to a verdict of not guilty. Prosecutors then brought the instant federal charges based on the two firearms recovered from under Defendant's bed.

**II.      Procedural Background.**

The Court held a hearing on Defendant's motion on September 1, 2005. The parties attended the hearing expecting to make only legal arguments. Defendant intended to argue that Scheidler knowingly and intentionally withheld significant and exculpatory evidence from the state district court judge in order to establish probable cause for a warrant to arrest Defendant, and

that, therefore, the warrant was defective and was issued without probable cause. At the hearing, however, it became clear that the issue of whether there was probable cause to support the arrest warrant was not relevant, so long as the arresting officer had probable cause to arrest Defendant *at the time of the arrest*. *United States v. Broward*, 594 F.2d 345, 350 (2d Cir. 1979) ("The distinction is crucial because the arrest was legal if the arresting officers had probable cause to make the arrest. This is so even if the arrest warrant was invalid." (citing *United States v. Watson*, 423 U.S. 411 (1976)). Consequently, an evidentiary hearing was held on Friday, September 23, 2005, to determine if Scheidler had probable cause to arrest Defendant at the time of the arrest. On October 27, 2005, the Court held a hearing on the issue of whether Defendant or his wife consented to the search of their residence. As a result of testimony which was elicited from Defendant's wife, Defendant conceded that his wife had consented to the search and withdrew his motion as it related to the issue of consent. All that remains before the Court is to determine whether Scheidler had probable cause to arrest Defendant at the time of the arrest.

**III.   Discussion**

The Fourth Amendment prohibits only unreasonable searches and seizures. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ." *Watson*, 423 U.S. at 417 (quoting *Carroll v. United States*, 267 U.S. 132, 156 (1925)). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371

(2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The Supreme Court explains probable cause as follows:

> On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

*Pringle*, 540 U.S. at 370-371 (quotations and citations omitted).

Defendant contends that Scheidler did not have probable cause to arrest him because there was sufficient evidence to cast doubt on Newman's account of the murder. Defendant relies on *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999), which stated:

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. An eyewitness identification will constitute sufficient probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'"

*Id.* at 370 (citations omitted) (quoting *Rainer v. Lis*, 16 F.3d 1221, 1994 WL 33969, at *2 (6th Cir. 1994) (unpublished table decision). Defendant argues that Scheidler was in possession of sufficient evidence to reveal that Newman's second statement was not trustworthy. Specifically, Scheidler knew that 1) Bradshaw and Newman had a falling out because Bradshaw had shorted Newman on a drug purchase; 2) Newman had told Bradshaw not to return until he had made it right; 3) Newman

had expected Bradshaw to give him money, yet Bradshaw did not have it; 4) Newman had returned from the scene of the murder and stated that something bad had happened and that he might go to jail for it; 5) Newman's first statement to Scheidler denied knowledge of what happened; 6) Corey Green had threatened Bradshaw; 7) Newman had been in jail two days when he made his second statement implicating Defendant; and 8) No other witness had seen Defendant at Newman's residence.

Although this evidence may seem substantial, when it is considered alongside all of the available evidence it fails to cast enough doubt on Newman's second statement to eliminate Scheidler's probable cause. First, Newman and Bradshaw were friends from childhood and the dispute involved a small amount of drugs and money. Green described the "disagreement" as a common, nonviolent occurrence. Second, Hardnett's statement clearly expressed that Newman had not committed a wrong himself, but that he had witnessed one. Fear of accomplice liability, or a possible reluctance to accuse his uncle, may explain his first denial. Third, Newman's second statement was made in the presence of, and after having consulted with, counsel. The two days Newman spent in jail could have convinced him not to take the blame for something he had not done, just as easily as it could have convinced him to falsely place the blame on someone else. Fourth, Newman owned a small-caliber rifle, not a large caliber-pistol as was used to kill Bradshaw. Further, it would be foolish for Newman to assassinate Bradshaw in his own residence after witnesses had seen him accompany Bradshaw there. Fifth, Defendant was at Newman's residence for a brief while, only long enough to commit the murder, which explains why no other witness placed Defendant at the scene. Finally, multiple witnesses corroborated Defendant's motive for

killing Bradshaw.

The Court finds that Newman's second statement was sufficiently trustworthy and that the totality of the circumstances adequately corroborated it so as to constitute probable cause to arrest Defendant.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Defendant's motion to quash [docket entry 9] is **DENIED**.

**SO ORDERED.**

Dated:   December 2, 2005             s/Paul V. Gadola
                                      HONORABLE PAUL V. GADOLA
                                      UNITED STATES DISTRICT JUDGE

---

Certificate of Service

I hereby certify that on   December 5, 2005  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
                    Robert W. Haviland; Barry A. Wolf                    , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                                                            .

                                      s/Ruth A. Brissaud
                                      Ruth A. Brissaud, Case Manager
                                      (810) 341-7845